UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEAST DIVISION

JAMES ENDSLEY,                           ]
                                         ]
    Plaintiff(s),                        ]
                                         ]
    vs.                                  ]   CV-01-CO-02516-NE
                                         ]
ROADWAY EXPRESS, INC.,                   ]
                                         ]
    Defendant(s).                        ]

**ENTERED**
MAR 3 0 2004

## MEMORANDUM OF OPINION

**I.    INTRODUCTION.**

    This is an action brought pursuant to Title VII of the Civil Rights Act of 1964.  The Court has for consideration a motion for summary judgment or partial summary judgment, filed November 7, 2002, by defendant Roadway Express, Inc. (hereinafter, "Roadway"). [Doc. 50.]  Also before the Court is Roadway's motion to exclude the EEOC determination, filed January 16, 2003. [Doc. 62.]  The issues have been briefed and are now ripe for decision.  Upon due consideration, and for the reasons set out below, the motion to exclude the EEOC determination will be GRANTED.  The motion for summary



judgment will be DENIED.  The motion for partial summary judgment will be GRANTED as to Endsley's disparate treatment claims.

## II.    SUMMARY JUDGMENT STATEMENT OF FACTS.[1]

The defendant, Roadway, is a trucking company that hauls freight to and from various locations in the United States.  Plaintiff's Brief, Doc. 60, (hereinafter, "Pl's Br.") p. 1; Defendant's Brief, Doc. 58, (hereinafter, "Def's Br.") p. 2.  The plaintiff, James Endsley (hereinafter, "Endsley"), is an African-American male employed by Roadway since March 11, 1974.  Pl's Br. p. 1; Def's Br. pp. 3-4.  Endsley is a road driver who works out of the Nashville relay terminal.  Endsley Dep., Pl's. Ex. 1, p. 22 (Hereinafter, "Endsley Dep.").   Previously, Endsley made the run from Nashville to Huntsville twice a night, but he had changed to the Nashville to Birmingham route about two years prior to his August 9, 2002, deposition.  Endsley Dep. pp. 25-30.  On his new Nashville to Birmingham route, he makes only

---

[1] In developing the facts for this opinion, the Court considered the facts proposed by the parties in their briefs and the Court's own examination of the record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

occasional stops in Huntsville.  *Id.*   He estimated he had stopped in Huntsville about five times in the two years he had the Birmingham route and stayed at the terminal between fifteen minutes and one-half hour.  *Id.*

Stanley Shanks has been the Huntsville terminal manager since 1996. Pl's. Br. p. 1, Def's. Br. p. 2. Shanks supervises the dock supervisors and the dispatchers at the Huntsville terminal.  *Id.*

When Endsley worked the Nashville to Huntsville route, he arrived at the Huntsville terminal about eight o'clock at night and stayed about fifteen minutes to an hour depending on when the outbound freight was ready. Endsley Dep. pp. 45-50.  Other than hooking and unhooking trailers, he did not have to perform any work at the Huntsville terminal.  *Id.*  He returned to the Huntsville terminal a second time each evening between eleven-thirty and midnight, again waiting fifteen minutes to an hour for additional outbound freight.  *Id.*

III.   THE MOTION TO EXCLUDE.

Endsley filed a charge of discrimination with the EEOC.  Plaintiff's Summary Judgment Exhibits, Doc. 59 (hereinafter, "Pl's Ex."), Ex. 12.  He initiated this action on October 5, 2001. On September 23, 2002, the EEOC

issued its determination that there was "reasonable cause to believe that [Roadway] discriminated against [Endsley] with respect to discriminatory discipline, job assignment, assignment of equipment, denial of awards and exclusion from safety meetings." Pl's Ex. 14.  The EEOC also determined that Roadway discriminated against Endsley and "[b]lacks as a class by subjecting them to a racially hostile work environment, denying them equal promotional opportunities to supervisory positions, assignment to less favorable jobs, unequal assignment of equipment and discriminatory discipline." *Id.*

Roadway contends the EEOC determination should be excluded under Fed. R. Evid. 803(8) because it is hearsay which does not meet the "trustworthiness" requirements for admission of public documents, under Rules 401 and 403 because it is irrelevant, and under Rule 403 because it is more prejudicial than probative.

The EEOC's final decision regarding a claim of discrimination is admissible under Fed. R. Evid. 803(8)(C), providing for admissibility of public records and reports setting forth factual findings resulting from an investigation made pursuant to authority granted by law, unless the source

of information or other circumstances indicate lack of trustworthiness.

*Chandler v. Roudebush,* 425 U.S. 840, n.39 (1976). However,

> [t]he admission of an EEOC report, in certain circumstances,
> may be much more likely to present the danger of creating
> unfair prejudice in the minds of the jury than in the mind of the
> trial judge, who is well aware of the limits and vagaries of
> administrative determinations and better able to assign the
> report appropriate weight and no more.

*Walker v. NationsBank of Fla., N.A.,* 53 F.3d 1548, 1554 (11th Cir. 1995),

*citing Barfield v. Orange County,* 911 F.2d 644, 651 (11th Cir. 1990) and

*Johnson v. Yellow Freight System, Inc.,* 734 F.2d 1304, 1309 (8th Cir. 1984)

(for the proposition that "EEOC reports are not homogenous products but

may vary greatly in quality and factual detail"). Thus, in the Eleventh

Circuit, EEOC determinations are generally admissible in bench trials, but

are subject to more limited admissibility in jury trials. *Walker,* 53 F.3d at

1554.[2] "In particular, the difference between a bench and a jury trial may

affect the district court's analysis of a determination letter's admissibility

---

[2]The plaintiff argues that this summary judgment proceeding is more akin to a
bench trial, and that the Court should not consider the prejudicial weight of the
evidence as if it were presented to a jury. However, in ruling on a summary judgment
motion, this Court must determine if there is a genuine question of material fact
necessitating a trial. That exercise would be futile if the Court considered evidence
which the jury could not consider.

under Federal Rules of Evidence 403." *Id.* The decision concerning admissibility of the EEOC's determination letter, as with any evidence, is committed to the broad discretion of the trial court and will be reversed only upon a clear showing of abuse of discretion. *Id.* The district court must make the admissibility determination on an individual basis, considering the evidence's probative value and the danger of unfair prejudice. *Latham v. Dep't of Children and Youth Svcs.*, 172 F.3d 786, 791 (11th Cir. 1999).

Being mindful of this Court's duty to assure the full availability of the judicial forum in employment discrimination cases, *Walker*, 53 F.3d at 1554, the Court finds the probative value of the EEOC determination letter is outweighed by the danger of unfair prejudice. The letter includes only the conclusion of the district director, without even minimal details about the investigative procedure used or the data considered. Without some indicator of the basis for the determination, this Court cannot conclude that the EEOC's sources of information were trustworthy, that the investigation was timely, or that a hearing was held. *See* Rule 803(8)(C), and Advisory Comments. Certainly, the lack of supporting detail limits the probative

value of the determination. Given the minimal probative value of the submission and the danger that the jury will place undue emphasis on the determination, the Court finds the determination should be excluded pursuant to Fed. R. Evid. 403.

IV. SUMMARY JUDGMENT STANDARD.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the

court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

V.    DISCUSSION.

Endsley has expressly disavowed any claim based on retaliation or discrimination in the terms and conditions of his employment, except he claims he was subjected to a racially hostile work environment at Roadway's Huntsville terminal. Pl's. Br. pp. 2, 3-6, 20-26.   Roadway claims it is entitled to summary judgment as to Endsley's hostile environment claim.

A.    Admissibility of the Evidence.

Roadway contends that much of Endsley's evidence is inadmissible hearsay or his own subjective beliefs and unfounded speculation. *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995).

Hearsay is an out-of-court statement which is offered into evidence to prove the truth of the matter asserted. Fed. R. Evid. 801. As a general rule, the evidence in question in this matter consists of testimony from various co-workers that Rozea told them about remarks Shanks or Massey made during a meeting Rozea attended. Rozea's testimony about the remarks would not be hearsay,[3] if the out-of-court statements of Shanks and Massey are offered only to show the statements were made, not to prove the truth of the matter asserted. However, a deponent's testimony that Rozea told him that Shanks and Massey made such statements is offered to prove the truth of Rozea's statement, and is, therefore, inadmissible hearsay. The following evidence will not be considered because it is inadmissible hearsay: (1) Jefferson Dep., Pl's. Ex. 8, pp. 129-42 (testifying

---

[3]But see discussion, *infra* regarding remarks heard by co-workers and not by the plaintiff.

Page 9 of 23

about what Rozea told him Shanks said); (2) Brazelton Dep., Pl's. Ex. 6, pp.

114-17 (testifying about what Rozea told him Shanks and Massey said); (3)

Jefferson Dep., Pl's. Ex. 8, p. 154(testifying about what Cross told him a co-

worker said); (4) Brazelton Dep., Pl's. Ex. 6, pp. 114-20)(testifying about

what Cross told him a co-worker said); (5) Scruggs Dep., Pl's. Ex. 5, pp. 81-

92 (testifying about what Rozea told him Shanks, Massey and co-workers

said); (6) Kennedy Dep., Pl's. Ex. 4, pp. 118-24, 130-32 (testifying about

what Rozea told him Shanks, Massey and a co-worker said); (7) Rozea Dep.,

Pl's. Ex. 3, p. 206 (testifying about what Brazelton told him about Shanks).

Endsley also relies on the deposition testimony of co-workers regarding

comments they heard or incidents they witnessed.  Evidence of comments

heard by other persons can be relevant in a Title VII case.   A

decisionmaker's routine use of racial slurs can be evidence that racial

animus was a motivating factor in making a disciplinary decision. *See, e. g.

Brown v. East Miss. Elec. Power Ass'n.,* 989 F.2d 858, 861-2 (5th Cir. 1993).

Moreover, a plaintiff may have a viable hostile environment claim even if

racial remarks were not directed at him.   *Edwards*, 49 F.3d at 1522.

However, a plaintiff in a hostile environment case must show that the

harassing conduct was sufficiently severe or pervasive to alter the terms or conditions of his employment. "This requirement, as defined by the Supreme Court, contains both an objective and a subjective component." *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1276 (11th Cir. 2002), *citing Harris v. Forklift Systems,* 510 U.S. 17, 21-22 (1993).   Incidents unknown to the plaintiff cannot contribute to his subjective view of a hostile environment. *Edwards,* 49 F.3d at 1522. (Discussing incidents made known to the plaintiff after her termination, speculative incidents, statements made to third parties by fourth parties, and incidents cited without information as to when they were made, how they were made and when they became known to plaintiff). The following evidence will not be considered in evaluating Endsley's hostile environment claim because there is no evidence he knew of the comments or incidents at any relevant time:[4] (1) Brazelton Dep., Pl's. Ex. 6, pp. 121-25, 302-03 (threat made in '70's by persons no longer at Roadway and comments at unspecified times); (2) Scruggs Dep., Pl's. Ex. 5, pp. 78-87 (comments); (3) Kennedy Dep., Pl's. Ex.

---

[4]Endsley testified he acquired knowledge of some incidents witnessed by other Roadway employees, particularly Nathan Rozea.   Endsley's testimony has been considered in evaluating his hostile environment claim, as discussed below.

4, pp. 118-20, 126-28 (comment); (4) Sanders Dep., Pl's. Ex. 9, pp. 135-36,

139, 304-08 (comment); (5) Rozea Dep., Pl's. Ex. 3, pp. 178-80, 202-03, 206,

449, 455, 457; Rozea 1/18/02 Affidavit, ¶¶ 14, 19 (comments).

Accordingly, the evidence considered in evaluating Endsley's hostile

environment claim will be limited to the following, cited in Endsley's brief:

(1) Endsley testified that, when he started a new bid on the Huntsville

run, Nathan Rozea told him Shanks said he had to stay in the driver's room.

Endsley Dep. pp. 51-53, 57-59, 267-68.[5]  Rozea told him to stay out of the

back office or the dock.  *Id.*  Endsley was angry because he had seen Ron

Tolbert, the other driver from Nashville, and another white road driver go

into the back office to make phone calls and talk with the office workers.

*Id.* at 62, 63-68, 97-98.[6]  Endsley complained to his Nashville supervisor,

_____

[5]Counsel stated in brief that Shanks ordered that Endsley be segregated from the
white drivers. Pl's. Br. p. 3. Endsley's testimony is only competent to prove what Rozea
said to him, not the truth of Rozea's statement. Fed. R. Evid. 801. Plaintiff has not
pointed to any admissible evidence to show what Shanks actually said. Pl's. Br. p. 3;
Endsley Dep. pp. 51-77.  *Macuba v. Deboer*, 193 F.3d 1316, 1322-25 (11th Cir.
1999)(discussing admissibility of hearsay evidence in summary judgment proceeding).

[6]Counsel stated in brief that white drivers had office and dock privileges which
Endsley was denied, and that Endsley was restricted while white drivers had free run of
the office and dock. Pl's. Br. p. 3. The evidence does not support this contention.
Although Endsley testified he saw white drivers in the office talking to the office workers
and using the phone, he did not see the drivers on the dock. Endsley Dep. pp. 67-68.
Further, he did not ask and did not know if the white drivers had been instructed, as he

Roger Morrison.  Endsley Dep. p. 53, 61-63.  The next day, Morrison told

Endsley that Shanks denied giving Rozea the instruction.  *Id.*  Rozea was

upset when Endsley got back to Huntsville and also told Endsley that Shanks

had denied giving the instruction and had told Rozea he had to be a team

player.  Endsley Dep. pp. 53-54, 72-77. This incident occurred about April

of 1999.  Endsley Dep. pp. 59-60.  Thereafter, Endsley did not go out on the

dock, but used the phone in the office if the direct phone to Nashville was

not working.  Endsley Dep. pp.  70-71.

    (2) Endsley testified he saw a doll display in the office at Roadway.

Endsley Dep. pp. 150-55.  He said:

> A.    Well, I remember seeing the – you are calling it a doll.  It
>       was something hanging there in the office forever – I won't
>       say forever – for a long time.  And I noticed it but I didn't-
>       like stick out to me like it was nothing in particular.  It was
>       a little black – I don't know, it was a little black – like
>       what you call a voodoo doll or crochet doll or something
>       like that hanging there by a string on the board there but
>       – no, at the time I wondered about like, why is that

---

had, to stay out of the office and off the dock.  Endsley Dep. pp. 65-66.  Finally, as
noted above,  Endsley used the phone in the office on occasion despite the instruction,
and he testified Shanks denied giving the instruction to Morrison and Rozea.  Although
there is no admissible evidence regarding what Shanks actually said, Endsley's testimony
shows that by the day after his complaint, he had no basis for believing he continued to
be restricted.

hanging there, you know. And I got to the point at one time I inquired about it, what is that, you know. And so - but it come up shortly afterwards, it wasn't there any more, for whatever reason, I don't know.

Q.   Was the doll racially offensive to you?

A.   It was like a little black figurine, a black doll hanging there by the - you know, hanging - it had like - had a, like a shoestring or some kind of - whatever was hanging there on the board, you know. And I just - yeah, I could take it as being offensive, you know.

. . .

Q.   What was the color of what would be the skin of the doll?

A.   The skin?

Q.   Yeah.

A.   It was cloth. It was like - best I remember it was made out of cloth. It was black - just black.

. . .

Q.   Did it have hair?

A.   I don't - no, I just remember there was something hanging there on the board and like a black figurine of some type hanging there on the board.

Q.   Did you associate the string with a noose or anything like that?

A.   Yes. It was maybe - that's what drew my attention to it, by it hanging it around -

Q.   Sir?

A.   That's what drew my attention by hanging around its neck of it, you know.

Endsley Depo., pp. 150-53. Endsley thought Kennedy or "Maurice" had

complained about the doll. *Id.* at 155.[7]

---

[7]Endsley did not testify he complained to Shanks about the doll, as was represented in brief. Pl's. Br. p. 3; Endsley Dep. pp. 150-55.

(3)   Endsley testified Maurice showed him a document he didn't

particularly like. Endsley Dep. pp. 165-66. He said:

| | |
|---|---|
| Q. | Among the documents that have been produced in this case is Exhibit Number Two.  Have you ever seen that before? |
| A. | Yes. |
| Q. | And when did you see that? |
| A. | Best I can remember like, Maurice had showed this to me and said he found it at the desk or somewhere around the office area. I don't know. I mean – |
| Q. | Did you say anything to Maurice about it? |
| A. | Did I say anything to Maurice about it? |
| Q. | Yes. |
| A. | I mean, other than this – I don't particularly like this type thing. I don't understand why it would be in, you know, up in the office. You know, I don't know. |
| Q. | And does this have racial connotations to you? |
| A. | Well, it seems like something the white people would gather around the water fountain and kid about, you know, the language or – yes. |

*Id.* Maurice Jefferson testified he found a paper with racial jokes face down

on an unidentified person's desk at an unknown time.  Jefferson Dep. pp.

156-61. Jefferson never told anyone in management about the paper.  *Id.*

(4) Rozea told Endsley (a) Massey called brazilian nuts "nigger toes"

Endsley Dep. p. 118 [8]; (b) Massey said Endsley was a cobra snake, although

---

[8]Endsley's testimony is admissible to show that Rozea made the statement, but
not to show the truth of Rozea's statement.

Endsley did not believe this was a racial remark; Endsley Dep. pp. 111-14,

Rozea Dep. pp. 314-19[9], Rozea Aff., Pl's. Ex. 17, ¶ 15; (c) Rozea was

supposed to give black drivers overtime and let the white drivers go home

early; Endsley Dep. p. 134, Rozea Dep. p. 239; (d) Massey had dogs named

"Nigger" and "Spook;" *Id.* at 168; (e) W. T. said about Sean's wife, "that

nigger girl she's was a real good looking woman" [sic] and W. T. said "he

didn't have nothing against niggers, he think everybody should be the proud

owner of one." *Id.* at 171-72[10]; (f) Shanks told Rozea to keep Endsley away

from other black employees; *Id.* at 266-69.  Endsley testified that "being

aware of what was happening to other black [people] that work [at

Roadway], you know, and that to me was like a hostile environment."

Endsley Dep. p. 99.

B.    The Merits of the Hostile Environment Claim.

Roadway claims it is entitled to summary judgment on Endsley's

harassment claim because the conduct he alleges is not sufficiently severe

---

[9]Rozea's testimony is admissible to show that Shank's and Massey's statements were made, but not to show the truth of the statements.

[10]Counsel attributed these comments to Massey in brief.  Pl's. Br. p. 5.  Counsel also cited page 178 of Endsley's deposition, but nothing was said on that page regarding racial comments.  Endsley Dep. p. 178.

to establish an objectively hostile working environment. "[C]laims of employment discrimination . . . present fact intensive issues. However. . . motions for summary judgment or judgment as a matter of law are appropriate to 'police the baseline for hostile environment claims.'" *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999)(en banc)(quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 n. 8 (5th Cir. 1999)).

To establish a hostile work environment claim under Title VII, the plaintiff must show "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993), *citing Meritor Savings Bank v. Vinson,* 477 U.S. 57 (1986). To prevail on a claim that he has been subjected to a racially hostile work environment, the plaintiff must present sufficient evidence to show: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee, such as race; (4) the harassment was sufficiently severe and

pervasive to alter the terms and conditions of employment and create an abusive working environment; and (5) the employer is responsible for such environment under either a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Harassing conduct is severe or pervasive if it results in (1) an environment that a reasonable person would find hostile or abusive; and (2) an environment that the victim subjectively perceives to be abusive. *Harris*, 510 U.S. at 21-22. Endsley has presented sufficient evidence that he subjectively perceived his work environment at Roadway to be hostile. However, Endsley must also show he was subjected to a working environment that a reasonable person would find hostile or abusive because of race. *See Mendoza*, 195 F.3d 1247-53 (discussing sufficiency of sexually hostile work environment showing). In evaluating the objective severity of harassing conduct, the court must consider the totality of the circumstances, including, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4)

whether the conduct unreasonably interferes with the employee's job performance. *Miller,* 277 F.3d at 1276.

"First and most importantly" Endsley did not present evidence of any physically threatening or humiliating behavior or show that the cumulative effect of the alleged conduct unreasonably interfered with his job performance. *Mendoza,* 195 F.3d at 1248.

This Court has considered evidence about the doll display in another case. *See Sean Scruggs v. Roadway Express, Inc.,* CV-01-CO-1959-NE, October 28, 2003, Memorandum of Opinion, Doc. 87, pp. 19-20.[11] Like Sean

---

[11]The evidence about the appearance of the doll display is inconsistent. As this Court noted in *Scruggs,* "Scruggs testified he saw two dolls, one larger white textured doll with dreadlocks hanging by a rope around its neck from the bulletin board and one 'brown textured' doll with no discernable hair hanging by a tack from the bulletin board. [Scruggs Dep. pp. 92-108.] One doll had a note under it that said, 'Today is not your day,' or words to that effect. *Id.* Scruggs thought the brown textured doll was supposed to be an animal, but felt the white textured doll was 'like a racial thing here in the south that reminds [him] of . . . heritage' he does not like. [Scruggs Dep. p. 96.] Maurice Jefferson testified he saw two dolls made of black cotton material with dreadlocks for hair hanging by a string around their necks on a board near the dispatcher's office. [Jefferson Affidavit, Doc. # 59, Vol 2, Ex. 4, pp. 262-70.] Jefferson did not complain about the dolls because Sean Scruggs had already complained. *Id.* The defendant submitted a photograph, which Stanley Shanks stated was a true and correct photograph of the only doll ever posted at the Huntsville terminal to his knowledge. [Doc. #43, Affidavit of Stanley Shanks.] The black and white photocopied photograph depicts one pale doll with short, possibly curly hair attached to the bulletin board by no visible means. A sign, similar to one described by Sean Scruggs, is near the doll. There is no evidence that Scruggs was ever shown the photograph or agreed that it depicted the display he saw." *Scruggs,* October 28, 2003, Memorandum of Opinion, pp. 15-16, n.

Page 19 of 23

Scruggs, Endsley presented evidence that he subjectively viewed the dolls as a depiction of black persons being lynched. The doll's owner might have intended to depict a lynching or may have been unaware of, or insensitive to, the possible context a black viewer of the display might bring to it.[12] Innocuous comments or conduct, even if boorish, are not considered in evaluating a hostile work environment claim, since Title VII is not a "general civility code." *Gupta*, 212 F.3d t 583. In *Scruggs*, the Court concluded there was no evidence of context to resolve the display's ambiguity. *See Mendoza*, 195 F.3d at 1248 (observing alleged comments could have had sexual connotations in some circumstances, but that there was no context indicating sexual connotation was appropriate in the circumstances of this interaction).

In contrast, the paper with "ebonic" jokes is unambiguously racially hostile. If the owner of the paper were known, it would tend to show his

---

9. The identical evidence was submitted in this action. Pl's. Ex. 1, 5; Doc. 58, Ex. 9. No description of the display unambiguously depicts a lynching, so that regardless of which description is accepted by the jury, the plaintiff has the burden of submitting additional evidence resolving the ambiguity.

[12]The Court is not accepting as true Stanley Shanks' out-of-court statement to Scruggs that the dolls were "dammit dolls." Scruggs Dep. p. 108. Rather, his testimony is an example of an equally likely purpose for the display.

or her state of mind and add context to more ambiguous conduct or comments. Unfortunately, Jefferson does not know who owned the paper or who knew about the paper other than himself. Moreover, the circumstances in which Jefferson found the paper were accidental, and the paper was placed face down on an unknown dispatcher's desk. This context does not indicate it was intended to harass him or any other black Roadway employee. Endsley's claim is more attenuated than Jefferson's, since he found out about the paper second-hand.

Endsley also relies on racially hostile comments made by Shanks and Massey which he heard about, second-hand, from Rozea. A plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at him. *Edwards,* 49 F.3d at 1521 (citation omitted). However, problems with hearsay and the contemporaneity of the plaintiff's knowledge are common when the plaintiff relies on comments made entirely outside his presence. *Edwards,* 49 F.3d at 1522.[13]

---

[13]At least one court has rejected a hostile environment claim based solely on second hand information. *Leibovitz v. New York City Transit Auth.,* 252 F.3d 179, 189-90 (2d Cir. 2001).

There is no evidence to support Endsley's claim in brief that Rozea's instruction to stay out of the office and off the dock was harassment due to his race. Although Endsley testified he saw white drivers in the office, he also testified that he used the phone in the office despite the instruction. He further testified he did not ask and did not know if the white drivers received the same instruction.

Finally, the fact that Endsley was based in Nashville and spent only thirty minutes to an hour at the Huntsville terminal each evening argues against a finding that he was subjected to severe and pervasive harassment.

The plaintiff in *Scruggs* has asked the Eleventh Circuit Court of Appeals for review of the Court's decision in his case.  Because Endsley relies on evidence nearly identical to that relied upon in *Scruggs*, the circuit court's decision in that matter will provide material guidance to the disposition of Endsley's hostile environment claim.  Accordingly, Roadway's motion for summary judgment will be denied as to Endsley's hostile environment claim, without prejudice to Roadway's right to renew the motion after the Eleventh Circuit renders a decision in *Scruggs*.

1.   Roadway's Liability.

Roadway argues it is not subject to liability because it established the affirmative defense established in *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742 (1998). *See Frederick v. Sprint/United Mgmt. Co.,* 246 F.3d 1305, 1313 (11th Cir. 2001) (if the plaintiff satisfies his burden, the defendant-employer is entitled to assert the *Faragher-Ellerth* affirmative defense). However, questions of material fact prevent summary judgment for Roadway on the basis of its affirmative defense.

VI.   CONCLUSION.

Roadway's motion for summary judgment will be granted as to all of Endsley's claims except the hostile environment claim. A separate order in conformity with this opinion will be entered.

Done, this _30_ of March, 2004.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE